**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| CONGAREE RIVERKEEPER, | ) | |
| | ) | Civ. No. _3:24-cv-3810-SAL_ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT FOR** |
| | ) | **DECLARATORY AND** |
| SHAW INDUSTRIES GROUP, INC., | ) | **INJUNCTIVE RELIEF** |
| | ) | |
| Defendant. | ) | |
| | ) | |

**INTRODUCTION**

1.  This is a citizen suit under the Clean Water Act ("CWA") and Resource Conservation and Recovery Act ("RCRA") to enjoin Defendant Shaw Industries Group, Inc. ("Shaw") from continuing its unpermitted discharges of toxic per- and polyfluoroalkyl substances ("PFAS") into the Saluda River, and its unlawful "open dumping" of PFAS and other solid and hazardous waste in the floodplain. This suit further seeks to redress the imminent and substantial endangerment to health and the environment posed by Shaw's releases of PFAS into groundwater and the Saluda and Congaree Rivers.

2.  Shaw owns and operates a 470-acre industrial facility on the banks of the Lower Saluda River in Columbia, SC ("Plant 8S"). Plant 8S manufactures synthetic fibers and resins that are used to make carpets.

3.  The Lower Saluda River is a State-designated Scenic River recognized for its outstanding recreational opportunities and trout fishery. Among other diverse uses, the Lower Saluda serves as the public water supply for the cities of West Columbia and Cayce, which draw their drinking water shortly downstream from Plant 8S.

4.   Plant 8S is continually discharging PFAS into the Lower Saluda River. PFAS are a class of industrial pollutants known as "forever chemicals" because they do not break down in the environment and build up (bioaccumulate) in the bodies of exposed people and fish. PFAS are highly toxic in extremely low quantities and are linked to a broad range of cancers, cardiovascular disease, developmental and immune system disorders, and other serious illnesses.

5.   Plant 8S has a National Pollutant Discharge Elimination System ("NPDES") permit to discharge limited quantities of certain pollutants into the Saluda River via designated outfalls. Ex. A (the "Permit"). Shaw is continually discharging PFAS through at least one such outfall, designated "Outfall 001" in the Permit. However, the Permit does not authorize Plant 8S to discharge PFAS. Shaw's discharges of PFAS thus violate Section 301(a) of the CWA, which prohibits the discharge of "any pollutant" into waters of the United States except in compliance with a permit. 33 U.S.C. § 1311(a).

6.   Plaint 8S utilizes a series of unlined lagoons and basins, pipes, and other infrastructure as part of its wastewater treatment system. Through years of industrial activity at the site, Shaw has deposited significant amounts of PFAS and other solid and hazardous waste in this system in the form of sludge and other wastewater byproducts. Upon information and belief, the unlined lagoons and basins, pipes, and other infrastructure containing these industrial wastes are leaching chemicals, including PFAS, into groundwater under the site, which carries these chemicals into the Saluda River.

7.   In addition, Plant 8S's unlined lagoons and basins, pipes, and other wastewater infrastructure sit within the Saluda River's 100-year floodplain. This subjects all of the PFAS and other industrial wastes deposited in the wastewater treatment system to "washout" from flooding. *See* 40 C.F.R. § 257.3-1(a)–(b). Under Section 4005(a) of RCRA, 42 U.S.C. § 6945(a),

2

the wastewater treatment infrastructure at Plant 8S constitutes an unlawful "open dump" and makes Shaw liable for "open dumping." *See* 40 C.F.R. §§ 257.1(a)(1)–(2), 257.3-1(a)–(b).

8.  Plant 8S's unpermitted discharges and open dumping of PFAS and other hazardous chemicals significantly harm the mission and members of Plaintiff Congaree Riverkeeper, which was founded to protect and improve water quality in the Lower Saluda and Congaree rivers.

9.  To cure these violations and remedy the harm to Congaree Riverkeeper and its members, Plaintiff seeks an order from this Court declaring that Defendant Shaw is violating Section 301(a) of the CWA, 33 U.S.C. § 1311(a), through its unpermitted discharges of PFAS; Section 4005(a) of RCRA, 42 U.S.C. § 6945(a), through its open dumping of PFAS and other solid and hazardous wastes; and Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), by creating an imminent and substantial endangerment to health and the environment through its releases of PFAS. Plaintiff respectfully requests an injunction compelling Shaw to cease this unlawful conduct at Plant 8S.

## JURISDICTION AND VENUE

10. Plaintiff brings its unpermitted discharge claim (Count I) under the citizen suit provisions of the CWA, 33 U.S.C. § 1365(a)(1), and its open dumping claim (Count II) and imminent and substantial endangerment claim (Count III) under the citizen suit provisions of RCRA, 42 U.S.C. § 6972(a)(1)(A)–(B). This Court has federal question jurisdiction under 28 U.S.C. § 1331 and may grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201(a) and 2202, 33 U.S.C. § 1365(a) (as to the CWA claim), and 42 U.S.C. § 6972(a) (as to the RCRA claims).

11. Venue is proper in the District of South Carolina under 28 U.S.C. § 1391(b)(1) and (2) because Defendant Shaw "resides" in Columbia and a "substantial part of the events or omissions giving rise to the claim occurred" in Columbia—namely, the unpermitted discharges,

open dumping, and imminent and substantial endangerment alleged in this suit, which are occurring at and near Shaw's Plant 8S located at 4401 St. Andrews Road in Columbia.[1] For these reasons, and because Shaw "does business relating to the events or omissions alleged" at Plant 8S in Columbia, venue is proper in the Columbia Division under Local Rule 3.01(A)(1).

12. Pursuant to 33 U.S.C. § 1365(b)(1) and 42 U.S.C. § 6972(b)(1)–(2), Plaintiff commences this action sixty days or more after giving written notice of the CWA and RCRA open dumping claims, and 90 days or more after giving written notice of the RCRA imminent and substantial endangerment claim, to the Administrator of the U.S. Environmental Protection Agency ("EPA"), to the South Carolina Department of Health and Environmental Control ("DES"[2]), and to the alleged violator Shaw. Ex. B (notice of intent to sue letter, sent via certified mail on March 4, 2024).

13. Neither the EPA nor the State of South Carolina has commenced or is diligently prosecuting a civil or criminal action in any state or federal court to redress the violations of the CWA or RCRA asserted in this suit.

---

[1] Indeed, venue is mandatory in this District for Plaintiff's CWA and RCRA claims because Shaw's violations of both statutes are occurring in this District. 33 U.S.C. § 1365(c)(1); 42 U.S.C. § 6972(a).

[2] On July 1, 2024, the Department of Health and Environmental Control was abolished and replaced by the new Department of Environmental Services ("DES"), which is which is "vested with all the functions, powers, and duties of the environmental divisions, offices, and programs of the Department of Health and Environmental Control." 2023 S.C. Laws Act 60, S.399, §§ 1, 4 (May 19, 2023). For simplicity, all references to the agency use the new abbreviation "DES," even where action was taken by the agency under its previous name before the July 1 abolition.

**PARTIES**

I.     **Plaintiff**

14.   Plaintiff Congaree Riverkeeper is a 501(c)(3) non-profit organization headquartered in Columbia, SC, with over 170 members and supporters, primarily in the greater Columbia area. Congaree Riverkeeper was founded to protect and improve water quality, wildlife habitat, and recreation on the Broad, Lower Saluda, and Congaree Rivers through advocacy, education, and where necessary, enforcement of environmental laws. Congaree Riverkeeper's "jurisdiction" includes the 11-mile stretch known as the Lower Saluda River where Plant 8S is located as well as the Congaree River downstream.

15. Members of Congaree Riverkeeper fish, kayak, boat, tube, and canoe in, and drink water sourced from, the Lower Saluda and Congaree rivers shortly downstream from Plant 8S, and have done so for decades. Members prize the cold waters of the Lower Saluda for its trout fishery and catch and eat catfish and other species from Congaree River. Concerns about Shaw's PFAS pollution have caused members to refrain from eating fish caught in these waters and reduced their enjoyment of angling. Members live in and regularly visit West Columbia and drink municipal water drawn from the Lower Saluda, which Shaw is polluting with PFAS. West Columbia lacks the advanced water treatment needed to remove PFAS from its water supply, and PFAS have shown up in the City's drinking water at levels exceeding EPA's drinking water standards. Shaw's PFAS pollution harms members' enjoyment of the water they drink and causes them concern for their health. These harms would be wholly redressed by a Court order enjoining Shaw's unlawful PFAS discharges and open dumping of PFAS, and the imminent and substantial endangerment posed by Shaw's PFAS releases, and assessing appropriate civil penalties.

5

## II.    Defendant

16. Defendant Shaw Industries Group, Inc. is incorporated in Dalton, Georgia. One of the world's largest flooring manufacturers, Shaw has factories and offices throughout the United States and abroad, with multiple manufacturing plants in South Carolina, including Plant 8S in Columbia. Shaw has owned and operated Plant 8S since 2005. At Plant 8S, Shaw manufactures fiber and nylon pellet chips to be used in the manufacture of carpeting and carpet-like materials.

## LEGAL FRAMEWORK

## I.    The Clean Water Act

17.  In 1972, Congress passed the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Congress established "the national goal that the discharge of pollutants into navigable waters be eliminated." *Id.* § 1251(a)(1).

18. To achieve these objectives, the CWA prohibits the discharge of "any pollutant" from a point source to "waters of the United States," *id.* §§ 1311(a), 1362(7), (12), except in compliance with, among other conditions, a NPDES permit issued under Section 402 of the Act, *id.* § 1342.

19. In South Carolina, EPA has delegated its authority to administer the NPDES permitting program to DES.

20. A pollutant may only be discharged by a NPDES permit holder if its presence in the discharge was adequately disclosed to the permitting agency in an application for a NPDES permit. "[T]o the extent that a permit holder discharges a pollutant that it did not disclose, it violates the NPDES permit and the CWA." *Piney Run Preservation Ass'n v. Cty Comm'rs*, 268 F.3d 255, 268 (4th Cir. 2001); *S. Appalachian Mtn. Stewards v. A&G Coal Corp.*, 758 F.3d 560, 565–68 (4th Cir. 2014).

6

21. Each pollutant discharge by a NPDES permit holder into waters of the United States that was not disclosed to the permitting agency is an unpermitted discharge in violation of the CWA, 33 U.S.C. § 1311(a).

22. Section 505(a)(1) of the CWA provides that "any citizen may commence a civil action on his own behalf . . . against any person  . . . who is alleged to be in violation of [] an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a)(1). The CWA defines "effluent standard or limitation" enforceable via citizen suit to include "an unlawful act under subsection (a) of section 1311 of this title [prohibiting unpermitted discharges of pollutants]." 33 U.S.C. § 1365(a)(1), (f).

23. In addition to awarding declaratory and injunctive relief for successful citizen plaintiffs, *see supra* ¶ 10, courts may also assess civil penalties against violators of the CWA. 33 U.S.C. §§ 1319(d), 1365(a); *see also* 40 C.F.R. §§ 19.1–19.4 (adjusting statutory penalties for inflation).

## II.     <u>The Resource Conservation and Recovery Act</u>

24. "RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). RCRA's express purpose is to reduce or eliminate the generation of hazardous waste as expeditiously as possible, and to treat, store, or dispose of "waste that is nevertheless generated . . . so as to minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b).

25. Among other restrictions, Section 4005(a) of RCRA prohibits "any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste . . . ." 42 U.S.C. § 6945(a). RCRA defines "open dump" as "any facility or site where solid waste is disposed of which is not a sanitary landfill and which meets the criteria promulgated under section 6944 of this title and which is not a facility for disposal of hazardous waste." *Id.* § 6903(14). In turn, "solid waste" includes "any garbage,

7

refuse, sludge from a waste treatment plant . . . and other discarded material, including solid, liquid, [or] semisolid . . . material resulting from industrial [or] commercial . . . operations[.]" *Id.* § 6903(27).[3] Courts take an "expansive" view of what constitutes "solid waste" under RCRA. *Charleston Waterkeeper v. Frontier Logistics, L.P.*, 488 F. Supp. 3d 240, 256 (D.S.C. 2020).

26. As noted, a facility must "dispose[] of" solid waste to qualify as an open dump. 42 U.S.C. § 6903(14). RCRA broadly defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste onto or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." *Id.* § 6903(3). RCRA's definition of "disposal" covers the "movement of the waste after it has been placed in a state of repose[.]" *United States v. Waste Industries Inc.*, 734 F.2d 159, 164 (4th Cir. 1984).

27. The EPA has promulgated criteria to clarify what facilities and practices constitute "open dumps" and "open dumping . . . prohibited under section 4005 of [RCRA]." 40 C.F.R. 257.1(a)(1)–(2). The regulations provide that "[f]acilities or practices in floodplains shall not . . . result in washout of solid waste, so as to pose a hazard to human life, wildlife, or land or water resources." *Id.* § 257.3-1(a). The "washout" of solid waste is defined as the "carrying away of solid waste by waters" of at least a 100-year flood. *Id.* § 257.3-1(b)(1), (3). "'Carrying away' does not require ongoing human conduct" and covers the movement of previously-disposed solid waste. *Potomac Riverkeeper, Inc. v. Nat'l Cap. Skeet & Transp. Club, Inc.*, 388 F. Supp. 2d 582, 587 (D. Md. 2005).

---

[3] "Hazardous waste" is a subset of "solid waste," *id.* § 6903(5), consisting of specific substances EPA has designated as "hazardous" by regulation, *id.* § 6921(a)-(b)(1), 40 C.F.R. §§ 261.30–.33, together with any other solid waste exhibiting one or more of the four "characteristics" of hazardous wastes: ignitability, corrosivity, reactivity, and/or toxicity. 40 C.F.R. §§ 261.20–.24.

28. RCRA provides that "any person may commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to [RCRA]." 42 U.S.C. § 6972(a)(1)(A).

29. Aside from the open-dumping prohibition, Section 7002(a)(1)(B) of RCRA allows affected persons to bring suit against "any person, … including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

30. In addition to awarding declaratory and injunctive relief for successful citizen plaintiffs, *see supra* ¶ 10, courts may also assess civil penalties against violators of RCRA. 42 U.S.C. §§ 6928(g), 6972(a).

## FACTUAL BACKGROUND

### I.     PFAS Endanger Human Health and the Environment.

31. PFAS refer to a class of thousands of synthetic chemicals that have been used in manufacturing since at least the 1940s and are known to be dangerous to human health and the environment. PFAS are used in various products to confer resistance to moisture, heat, stains, and oil.

32. These same properties also make PFAS highly persistent and resistant to degradation once released into the environment, earning the moniker "forever chemicals." PFAS bioaccumulate—or build up —in the bodies of humans and fish exposed to these toxins. PFAS

also biomagnify, moving up the food chain in progressively greater concentrations, up to and including in people. A major source of human exposure to PFAS is through drinking contaminated water. Another major source is through the consumption of contaminated fish.

33. PFAS pose a significant threat to human health at extremely low levels. PFAS have been shown to cause a broad range of harms to people, including developmental disorders in fetuses and infants, kidney and testicular cancer, cardiovascular disease, liver malfunction, hypothyroidism, high cholesterol, ulcerative colitis, obesity, decreased immune response to vaccines, reduced hormone levels, delayed puberty, lower birth weight and size, and other serious illnesses. One recent study "estimated that exposure to some PFAS may have played a role in about 6.5 million deaths in the U.S. from 1999–2018, primarily those caused by cancer and heart disease." Kyle Bagenstose, *Across the U.S., Towns warn of toxic PFAS chemicals in drinking water. Here's what to know*, USA TODAY (July 16, 2022), https://perma.cc/CRZ6-SLR3 (permanent link).

34. PFAS cause similar harms to fish and other wildlife exposed to these toxins. PFAS are widely found in fish tissue, particularly in freshwaters, which poses a risk not only to the fish themselves, but also to the people who consume fish. As one recent study concluded, "[e]ven a single serving of fish per year, at the median levels of [one common type of PFAS observed in freshwater fish], would lead to a measurable increase in blood serum levels [of the PFAS]." Nadia Barbo et al., *Locally caught freshwater fish across the United States are likely a significant source of exposure to PFOS and other perfluorinated compounds*, 220 ENV'TL RES. 115165, 9 (2023).

35. In addition to their toxicity, PFAS are water soluble and highly mobile once released into the environment. PFAS readily leach from soil into groundwater and connected surface waters.

Once in surface water, PFAS can travel dozens of miles from a discharge to taint drinking water sources downstream. Magnifying the threat, conventional drinking water treatments do not effectively remove PFAS. As a result, if PFAS contaminate the rivers and streams that feed public drinking water systems, the PFAS are likely to pass through and into the taps of residents.

36.    Due to these harms, EPA recently promulgated maximum contaminant levels ("MCLs") for several types of PFAS in drinking water under the Safe Drinking Water Act. 89 Fed. Reg. 32,532 (April 26, 2024). EPA's final rule set MCLs of 4 or 10 parts per trillion ("ppt") for five different PFAS compounds, and uses a "hazard index" to limit mixtures of various types of PFAS.[4] For context, 4 ppt is roughly one drop of water in five Olympic-sized swimming pools. Further underscoring the high toxicity of these chemicals, EPA set non-binding "maximum contaminant level goals" of zero (0) for perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), *id.* at 32,532, indicating that there is no level of these chemicals in drinking water that is known or anticipated to be safe. 42 U.S.C. § 300g-1(b)(4)(A).

37. For similar reasons, EPA has designated PFOA and PFOS as "hazardous substances" under the Comprehensive Environmental Response, Compensation, and Liability Act, based on robust scientific and technical evidence "that they may present a substantial danger to the public health or welfare or the environment when released." 89 Fed. Reg. 39,124 (May 8, 2024).

---

[4] EPA's final rule set MCLs of four (4) parts per trillion ("ppt") each for perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), and ten (10) ppt each for perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), and hexafluoropropylene oxide dimer acid ("GenX"), and uses a "hazard index" to limit mixtures of two or more of the compounds PFHxS, PFNA, GenX, and perfluorobutane sulfonic acid ("PFBS").

## II.     The Lower Saluda River



*Figure 1.* The Lower Saluda River downstream from Lake Murray Dam.

38. The Lower Saluda River flows out of the Lake Murray dam for 11 miles before meeting the Broad River near downtown Columbia to form the Congaree River. In 1991, nearly the entire stretch of the Lower Saluda River was designated as a State Scenic River by the South Carolina Legislature.

39. The Lower Saluda is recognized as an outstanding recreational resource. The cold waters released from the bottom of Lake Murray reservoir sustain a prized brown and rainbow trout fishery in the Lower Saluda, which is one of only a handful of South Carolina rivers classified as "Trout Put, Grow, and Take," S.C. Code Ann. Reg. § 61-69—meaning that the river can sustain the growth of stocked trout populations and a balanced, indigenous aquatic community of fauna and flora. *Id.* § 61-68(G)(8). The Lower Saluda also supports a notable striped bass fishery and a broad variety of other cold- and warmwater fish species, and is popular among paddlers, tubers, and swimmers.

40. Given its serene character in close proximity to urban Columbia, recreational attractions dot the River's banks. Saluda Shoals Park, which is located about 1.5 miles upstream of Plant 8S, is a popular regional park offering a public boat launch as well as canoe, kayak, and tube rentals. Further downstream, the Saluda Riverwalk and the West Columbia and Cayce Riverwalk Parks provide the public with additional waterfront access near where the Lower Saluda River merges into the Congaree.

41. The entire stretch of the Lower Saluda River and the first few miles of the Congaree River are within the legally-defined "Supply Source Water Protection Areas" for the cities of West Columbia and Cayce, which draw their drinking water shortly downstream of Plant 8S on the Congaree.

42. Unfortunately, these critical waters have been contaminated by industrial PFAS pollution.

43. In recent years, municipal tests of treated drinking water in West Columbia and Cayce have shown that the water in both cities is impacted by PFAS at levels near and exceeding the recently-promulgated MCLs. Recent in-stream sampling by DES of the source waters in the Lower Saluda and Congaree Rivers show similar levels of PFAS contamination as the treated drinking water.

44. Neither West Columbia nor Cayce have the advanced treatment installed at their drinking water plants that is needed to effectively remove PFAS from the source waters in the Lower Saluda and Congaree Rivers.

45. In 2022, DES caught and sampled for PFAS a Largemouth Bass, Channel Catfish, Redear Sunfish, and Gizzard Shad from the Congaree River shortly downstream from the Lower Saluda's inflow. Every fish sampled tested positive for PFAS. Two of the sampled species were contaminated with PFAS at levels near or exceeding those found in various fish species in North

Carolina's Cape Fear River—levels that prompted the N.C. Department of Environmental Quality in 2023 to recommend that people not eat or seriously limit their consumption of those fish. Upon information and belief, there are similar levels of PFAS in fish just upstream in the Lower Saluda River where Plant 8S's discharges occur.

### III.     Plant 8S is a Significant Source of PFAS Pollution on the Lower Saluda River.

46. Since 2005, Shaw has owned and operated a large industrial facility on the banks of the Lower Saluda River called Plant 8S, which manufactures synthetic fibers and resins that are used to make carpeting.



*Figures 2 and 3.* The unlined wastewater treatment lagoons and basins (above) and water intake system (below) at Shaw's Plant 8S on the banks of the Lower Saluda River.

14



47. Testing of carpets manufactured by Shaw has shown high levels of PFAS in these materials. Shaw's carpet plants in Georgia and Alabama have been the subject of multiple suits by municipalities and individuals alleging harmful PFAS contamination of waterways and drinking water. *See* Complaint for Declaratory and Injunctive Relief, *Fed Ins. Co. v. Shaw Indus., Inc.*, No. 1:23-cv-01367, ECF No. 1 at 10–12 (N.D. Ala. Oct. 11, 2023) (collecting PFAS cases against Shaw). This June, the City of Columbia filed a tort action in state court against Shaw and other PFAS users and manufacturers alleging that "Shaw discharged and continues to discharge wastewater containing PFAS upstream of where Columbia draws water." Amended Complaint, *City of Columbia v. 3M Company, Inc.*, No. 2024CP4003392, ¶ 55 (5th Cir. Richland Cty., June 4, 2024).

48. Shaw discharges the wastewater generated at Plant 8S pursuant to NPDES Permit No. SC0003557 issued by DES on June 26, 2013. That NPDES Permit expired on July 31, 2018. Although Shaw submitted a permit renewal application on January 30, 2018, DES has yet to

issue a decision on that application and has administratively continued Shaw's now-expired NPDES Permit.

49. Shaw's NPDES Permit and its permit renewal application disclose three discharge outfalls at Plant 8S. Two of the outfalls, Outfalls 002 and 003, consist of once-through noncontact cooling water and stormwater and discharge to Kinley Creek and the Saluda River, respectively. Shaw does not treat the water that is discharged from Outfalls 002 and 003.  The effluent characteristics for Outfalls 002 and 003, as reported in Shaw's NPDES Permit and its permit renewal application, do not disclose the presence of any PFAS compounds.

50. The other outfall, Outfall 001, consists of process wastewater, sanitary wastewater, boiler blowdown, and contaminated stormwater. Shaw treats these various wastewater streams at an on-site wastewater treatment plant and then discharges the final effluent to the Saluda River from Outfall 001. The effluent characteristics for Outfall 001, as reported in Shaw's NPDES Permit and its permit renewal application, do not disclose the presence of any PFAS compounds.

51. Despite not disclosing any PFAS discharges at Plant 8S, Shaw has discharged, and continues to discharge, PFAS pollutants from Outfall 001, and potentially other sources, into the Lower Saluda River.

52. On October 12 and December 14, 2023, Congaree Riverkeeper collected effluent samples at the mouth of Outfall 001 before it mixes with the Saluda River and had the samples analyzed by a professional lab.[5] Those samples contained at least 15 PFAS compounds at the following levels (reported in ppt):

---

[5] Congaree Riverkeeper's samples were analyzed for PFAS using EPA-recommended analytical methods according to procedures derived from the EPA's Contract Laboratory Program protocol.
.

| PFAS Constituent | Outfall 001 | |
|---|---|---|
| | 10/12/2023 | 12/14/2023 |
| Hexafluoropropyleneoxide dimer acid (HFPO-DA)(Gen-X) | 4.13 J | 7.55 |
| Perfluorobutane sulfonic acid (PFBS) | 1.03 J | 1.99 |
| Perfluorobutanoic acid (PFBA) | 22.7 | 5.03 J |
| Perfluorodecanoic acid (PFDA) | 20.6 | 6.63 |
| Perfluorododecanoic acid (PFDOA) | 6.71 | 3.02 |
| Perfluoroheptanoic acid (PFHpA) | 32 | 5.38 |
| Perfluorohexane sulfonic acid (PFHxS) | 0.912 J | 1.34 J |
| Perfluorohexanoic acid (PFHxA) | 40.6 | 8.03 |
| Perfluorononanoic acid (PFNA) | 12.5 | 2.77 |
| Perfluorooctane sulfonic acid (PFOS) | 5.29 | 7.7 |
| Perfluorooctanoic acid (PFOA) | 38.9 | 9.51 |
| Perfluoropentanoic acid (PFPeA) | 52.5 | 12 |
| Perfluorotetradecanoic acid (PFTDA) | 1.83 | 0.576 U |
| Perfluorotridecanoic acid (PFTrDA) | 0.763 J | 0.576 U |
| Perfluoroundecanoic acid (PFUnDA) | 2.66 | 1.04 J |
| Total PFAS | 243.125 | 73.142 |

*Table 1.* Congaree Riverkeeper's Surface Water Sampling of Outfall 001.[6]

53. Before it is discharged from Outfall 001 into the Lower Saluda River, Plant 8S's effluent is channeled through a wastewater treatment plant ("WWTP"). Shaw's WWTP comprises six equalization basins, two aeration basins, two clarifiers, and the north effluent holding pond (*Fig. 4*). All of the wastewater lagoons and basins are either entirely unlined or have earthen bottoms. The WWTP also comprises the pipes and other infrastructure that convey wastewater from operation areas at Plant 8S to the unlined lagoons and basins and then to Outfall 001.

---

[6] The qualifier "J" means the numerical value is an approximate concentration of the analyte in the sample because the constituent was detected above the method detection limit but not above the laboratory reporting limit. The qualifier "U" means the constituent was not detected above the stated method detection limit.

17



***Figure 4.*** Layout of wastewater treatment system at Plant 8S.

54. Shaw treats its wastewater using an activated sludge process that is not capable of effectively removing or destroying PFAS. In fact, studies have shown that activated sludge may have the opposite effect, *increasing* measurable PFAS concentrations in final effluent compared to the concentrations in raw effluent.[7]

55. The PFAS that remain after treatment are discharged by Shaw as final effluent from Outfall 001 and potentially other sources, accumulate in Shaw's wastewater lagoons, basins, and other treatment infrastructure, and/or are concentrated in the sewage sludge that is produced during treatment.

56. Shaw's PFAS discharges from Outfall 001 and other sources are ongoing because Shaw may continue to use PFAS in its manufacturing operations, and because Shaw's WWTP cannot

---

[7] Melissa M. Schultz et al., *Fluorochemical Mass Flows in a Municipal Wastewater Treatment Facility*, 40 ENVT'L SCI. & TECH. 7350 (2006), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2556954/ (accessed Feb. 20, 2024).

effectively remove PFAS before they are discharged from Outfall 001 and other sources. Even if Shaw were no longer using any PFAS in its industrial operations at Plant 8S, PFAS have accumulated over the years in Shaw's unlined lagoons and basins, pipes, and other treatment infrastructure and are continually contaminating Shaw's effluent prior to discharge.

57. Over the years, Shaw has disposed of and discarded PFAS and other toxic chemicals in its unlined lagoons and basins, pipes, and other treatment infrastructure in the form of sludge and other byproducts of the wastewater treatment process. Since at least 2014, Shaw has performed semi-annual groundwater monitoring at the facility, which shows that volatile organic compounds ("VOCs"), metals, and nitrate have leeched from the unlined lagoons and basins into groundwater.

58. The following are among the contaminants that have been detected by Shaw in groundwater monitoring wells downgradient of the wastewater lagoons and basins: acetone; benzene; ethylbenzene; isopropylbenzene; naphthalene; toluene; 1,2,4-trimethylbenzene; xylenes; arsenic; barium; cadmium; chromium; lead; and nitrate. On some dates in one particular monitoring well, the concentrations of arsenic, cadmium, lead, and nitrate have exceeded the maximum contaminant levels set by the EPA. To Plaintiff's knowledge, there has been no sampling for PFAS in the groundwater at Plant 8S. Given the presence of PFAS in Shaw's manufacturing process and wastewater effluent, and the ability of PFAS to move through soils, PFAS are also likely leaching from the unlined lagoons and basins containing Shaw's effluent, and potentially also from leaking pipes and other treatment infrastructure, into groundwater under the site.

19

59. PFAS and other pollutants likely enter the Lower Saluda River from Plant 8S via multiple pathways, including through groundwater, surface water, inundation from flooding, and stormwater.

60. According to groundwater reports for Plant 8S, the groundwater at the site flows from the WWTP a short distance toward the Lower Saluda River. This groundwater flow carries PFAS and other toxins leaching from the unlined lagoons and basins, pipes, and other treatment infrastructure a short distance until they discharge into the Lower Saluda River via groundwater. This is in addition to the surface water discharges of PFAS via Outfall 001 and potentially other sources.

61. Outfall 001 conveys Plant 8S's wastewater effluent via an unlined ditch that runs roughly a half-mile from the WWTP through a series of wetlands and into the Lower Saluda River. As noted, PFAS in Plant 8S's effluent are conveyed via this surface water conduit from the WWTP into the Lower Saluda River. Additionally, because Outfall 001 and large parts of the WWTP are unlined, PFAS are also likely leaching from the WWTP into groundwater that permeates the wetlands and unlined channels for Outfall 001 before discharging into the Lower Saluda River.

62. Flooding presents another pathway for chemical releases. Shaw's unlined lagoons and basins and other WWTP infrastructure lie about 350 yards northeast of the Saluda River—entirely within the 100-year floodplain, according to Shaw's consultants. Based on data from the South Carolina Office of Resilience, a 100-year flood would threaten Plant 8S with over three (3) feet of flooding inundation from the Lower Saluda River. Photographs from DES site inspections indicate that some or all of Shaw's wastewater lagoons and basins are at ground level, likely beneath the level of 100-year flood waters. Far from hypothetical, Plant 8S has previously been impacted by severe flooding, including during an October 2015 event which inundated Outfall

20

002 and ruined the facility's flow and temperature meters. The flood risks to Shaw's WWTP are only increasing as climate change drives more severe rainfall events in South Carolina.

63. Upon information and belief, flood waters from the Saluda River have reached Plant 8S and carried away PFAS and other solid and hazardous wastes from the WWTP; this is highly likely to recur as long as Shaw's wastes remain in the floodplain.

64. Finally, rainwater falling on the site likely comes into contact with production and storage areas and potentially wastewater treatment areas at Plant 8S, becomes contaminated with PFAS, and then discharges into Kinley Creek on the eastern boundary of the property and to the Saluda River via Outfalls 001, 002, and 003, and potentially other sources. On October 5, 2022, Congaree Riverkeeper took a surface water sample of Kinley Creek downstream of Shaw's stormwater discharge and found that it contained numerous types of PFAS. Thus, Shaw's stormwater discharges are likely another pathway for PFAS to enter the Saluda River.

65. Plant 8S's discharge, disposal, and release of PFAS and other solid and hazardous wastes poses a hazard to humans and wildlife, contaminating the Lower Saluda with highly toxic chemicals that may enter and accumulate in fish and people who eat these fish, as well as drinking water sourced from the Lower Saluda and Congaree Rivers that is used by thousands of South Carolinians.

## **CLAIMS FOR RELIEF**

### **COUNT I:**
**Shaw's Unpermitted Discharges of PFAS from Outfall 001 and Other Sources
Violate Section 301(a) of the CWA, 33 U.S.C. § 1311(a)**

66. The allegations of paragraphs 1 through 65 are incorporated herein by reference.

21

67. Section 301(a) of the CWA prohibits the discharge of "any pollutant" by any person into "waters of the United States" from "any point source" without a permit. 33 U.S.C. §§ 1311(a), 1362(12), 1362(7).

68. Plant 8S has discharged, and continues to discharge, PFAS from Outfall 001 and other sources into the Saluda River.

69. PFAS discharged from Plant 8S are "pollutant[s]." *Id.* § 1362(6) ("The term 'pollutant' means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.").

70. The Saluda River is a traditional navigable water and "water of the United States." *Id.* § 1362(7).

71. Outfall 001 is a "point source" regulated as such in Shaw's NPDES Permit and otherwise meeting the definition of a "point source" because it is a pipe and/or ditch conveying treated effluent from Shaw's WWTP to the Saluda River. *Id.* § 1362(14) ("The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are discharged or may be discharged.").

72. Plant 8S's NPDES Permit does not authorize any discharges of PFAS from Plant 8S and Shaw did not disclose any discharges of PFAS to DES in its application for a NPDES Permit.

73. Plant 8S's discharges of PFAS from Outfall 001 and other sources are thus unpermitted and in violation of Section 301(a) of the CWA.

74. Pursuant to Section 505(a)(1) of the CWA, *id.* § 1365(a)(1), Plaintiff Congaree Riverkeeper initiates this citizen suit to cease Shaw's violations of Section 301(a) of the Act, *id.* § 1311(a).

### COUNT II:
**Shaw's Disposal of PFAS and Other Solid and Hazardous Wastes
in the Floodplain Constitutes 'Open Dumping'
in Violation of Section 4005(a) of RCRA, 42 U.S.C. § 6945(a)**

75. The allegations of paragraphs 1 through 74 are incorporated herein by reference.

76. Section 4005(a) of RCRA prohibits "any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste[.]" 42 U.S.C. § 6945(a).

77. RCRA defines "open dump" as "any facility or site where solid waste is disposed of which is not a sanitary landfill and which meets the criteria promulgated under section 6944 of this title and which is not a facility for disposal of hazardous waste." *Id.* § 6903(14).

78. Plant 8S, including the WWTP, is not a sanitary landfill or hazardous waste disposal facility.

79. Shaw disposes of solid and hazardous waste in and around the unlined lagoons and basins, pipes, and other infrastructure comprising the WWTP at Plant 8S, including PFAS; acetone; benzene; ethylbenzene; isopropylbenzene; naphthalene; toluene; 1,2,4-trimethylbenzene; xylenes; arsenic; barium; cadmium; chromium; lead; and nitrate.

80. These wastes constitute "solid waste" under RCRA because they are disposed of in the form of sludges from the WWTP and other solid, liquid, or semisolid byproducts of Plant 8S's industrial wastewater treatment process. *See id.* § 6903(27) (defining "solid waste" as "any garbage, refuse, sludge from a waste treatment plant . . . and other discarded material, including

23

solid, liquid, [or] semisolid . . . material resulting from industrial [or] commercial . . . operations").

81. These solid and hazardous wastes are discarded and "disposed of" because Shaw places, deposits, discharges, and dumps them into Plant 8S's unlined lagoons and basins, pipes, and other wastewater treatment infrastructure in a manner that causes their escape into the environment by leaching into groundwater that flows into the Saluda River; being carried away by flood waters; and being washed away and discharged by stormwater. *See id.* § 6903(3) (defining "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste onto or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters").

82. The WWTP facilities at Plant 8S constitute an "open dump" which "meets the criteria promulgated under section 6944 of" RCRA. *Id.* § 6903(14). Specifically, Shaw's disposal of solid waste in the unlined lagoons and basins, pipes, and other WWTP infrastructure in the Saluda River's floodplain "result[s] in washout of solid waste," defined as the "carrying away of solid waste by waters" of at least a 100-year flood. 40 C.F.R. § 257.3-1(b)(1), (3). Such washout poses a "hazard to human life, wildlife, [and] land [and] water resources," *id.* § 257.3-1(a), by washing highly toxic chemicals into the Lower Saluda River, a fish and drinking water source for thousands of South Carolinians.

83. Pursuant to Section 7002(a)(1)(A) of RCRA, 42 U.S.C. § 6972(a)(1)(A), Plaintiff Congaree Riverkeeper initiates this citizen suit to cease and remediate Shaw's "open dumping" of solid and hazardous waste in violation of Section 4005(a) of RCRA, *id.* § 6945(a).

24

## COUNT III:
### Shaw's Handling, Storage, Treatment, and Disposal of PFAS May Present an Imminent and Substantial Endangerment to Health or the Environment in Violation of Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B)

84. The allegations of paragraphs 1 through 83 are incorporated herein by reference.

85. Section 7002(a)(1)(B) of RCRA authorizes citizens to bring suit "against any person … including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

86. Since at least 2005 to the present day, Shaw has handled, stored, treated, and disposed of PFAS in and around the unlined lagoons and basins, pipes, and other infrastructure that comprise the WWTP at Plant 8S.

87. These PFAS are "solid waste" under RCRA because they constitute "sludge from a waste treatment plant" and "other discarded material, including solid, liquid, [or] semisolid . . . material resulting from industrial . . . operations." *Id.* § 6903(27).

88. These PFAS are also "disposed of" within the meaning of RCRA because Shaw "plac[es]," "deposit[s]," "discharge[s]," "leak[s]," and "dump[s]" them into Plant 8S's unlined lagoons and basins, pipes, and other wastewater treatment infrastructure in a manner that causes them to enter the environment and be discharged into surface water and groundwater. *Id.* § 6903(3).

89. The continued presence and entry of PFAS into the environment from Plant 8S, including into groundwater and the Lower Saluda River and Congaree River, may present an imminent and substantial endangerment to: (i) people who rely on those waters for drinking water, (ii) people

who consume fish from those waters, and (iii) the aquatic and terrestrial ecosystem, including the fish and other aquatic life residing in those waters as well as the birds and wildlife consuming fish that are exposed to Shaw's PFAS contamination.

**PRAYER FOR RELIEF**

For the reasons stated herein, Plaintiff respectfully requests that the Court:

90.     Declare that Shaw's discharges of PFAS from Outfall 001 and other sources at Plant 8S violate Section 301(a) of the CWA, 33 U.S.C. § 1311(a);

91.     Declare that Shaw's disposal of solid and hazardous waste in the unlined lagoons and basins, pipes, and other infrastructure comprising the WWTP at Plant 8S constitutes "open dumping," and that the WWTP constitutes an "open dump," in violation of Section 4005(a) of RCRA, 42 U.S.C. § 6945(a);

92.     Declare that Shaw's handling, storage, treatment, and disposal of PFAS at Plant 8S may present an imminent and substantial endangerment to health or the environment, in violation of Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B);

93.     Enjoin Shaw from discharging PFAS from Outfall 001 and other sources at Plant 8S;

94.     Enjoin Shaw from disposing of solid and hazardous waste in the unlined lagoons and basins, pipes, and other infrastructure comprising the WWTP at Plant 8S and order Shaw to remediate the WWTP such that it no longer constitutes an open dump;

95.     Order Shaw to take such action as may be necessary to eliminate the imminent and substantial endangerment to health or the environment;

96.     Assess appropriate civil penalties against Shaw for its violations of the CWA and RCRA;

26

97.     Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

98.     Grant Plaintiff such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 2nd day of July 2024.

/s/ Catherine M. Wannamaker
Catherine M. Wannamaker
SC Bar No. 12577
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, South Carolina 29403
Telephone: (843) 720-5270
cmwannamaker@selcsc.org

/s/ Carl T. Brzorad
Carl T. Brzorad
SC Bar No. 105413
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, South Carolina 29403
Telephone: (843) 720-5270
cbrzorad@selcsc.org

*Attorneys for Plaintiffs*